So Ordered.

Signed this 11 day of July, 2023.



_____

Wendy A. Kinsella

United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In re:

KENNETH W. WORDEN and                           Chapter 12
PATRICIA M. WORDEN,                              Case No. 22-60094-6

                                   *Debtors*.

_____

APPEARANCES:

ORVILLE & McDONALD LAW, PC                       PETER ORVILLE, ESQ.
*Attorney for Debtors*
30 Riverside Drive
Binghamton, NY 13905

VLOCK & ASSOCIATES, PC                           STEPHEN VLOCK, ESQ.
*Attorney for NG Solutions LLC*
630 Third Avenue, 18th Floor
New York, NY 10017

Mark W. Swimelar                                 EDWARD J. FINTEL, ESQ.
*Chapter 13 Trustee*
250 South Clinton St., Suite 203
Syracuse, NY 13202

Honorable Wendy A. Kinsella, Chief United States Bankruptcy Judge[1]

---

[1] This case was pending before Chief Bankruptcy Judge Diane Davis prior to her retirement on March 5, 2023, at which time it was transferred to Hon. Wendy A. Kinsella.  All observation and credibility assessments referenced herein were provided by Chief Judge Davis.  *See In re EM Equip., LLC*, 504 B.R. 8, 11 n.3 (Bankr. D. Conn. 2013).

## <u>MEMORANDUM-DECISION AND ORDER</u>

### INTRODUCTION AND PROCEDURAL BACKGROUND

Presently before the Court is Creditor NG Solutions LLC's ("NG") Motion to Dismiss Case for Bad Faith Serial Filings under § 1208(c) ("Motion to Dismiss"), or in the alternative, Motion for Relief from Stay pursuant to §§ 362(d)(1), (d)(2), and (d)(4) ("Motion for Alternative Relief") (ECF No. 10),[2] and related Objection to Confirmation ("Objection to Confirmation") (ECF No. 26) of Kenneth and Patricia Worden's ("Debtors") proposed chapter 12 Plan (the "Plan") (ECF No. 19).[3]  Pursuant to the Amended Scheduling Order (ECF No. 69), the Court conducted an evidentiary hearing on December 7, 2022 (the "Hearing") at which all of NG's exhibits were stipulated into evidence.  Debtor Kenneth Worden, his brother Charles Worden, and their expert witness, Gary Conklin testified on behalf of Debtors.  NG presented its expert witness Bruce Dehm.  Mark W. Swimelar, Chapter 12 Trustee (the "Trustee") appeared through his counsel, Edward J. Fintel, Esq.  At the close of testimony, Debtors and NG (the "Parties") were afforded an opportunity to submit post-hearing memoranda of law by January 6, 2023.  (ECF Nos. 80 and 81).  The matter was taken under advisement on that date.

As required by Federal Rule of Civil Procedure 52 ("FRCP"), made applicable to this bankruptcy proceeding by Federal Rule of Bankruptcy Procedure 7052 ("FRBP"), the Court renders the following findings of fact and conclusions of law.  For the reasons detailed below, the Court denies NG's Motion to Dismiss and Motion for Alternative Relief and overrules its

---

[2] Citations to docket entries within the current bankruptcy proceeding will be (ECF No. __); citations to docket entries within Debtors' previous bankruptcy cases will be (Bankr. [case number] at ECF No. __).

[3] Debtors filed a First Amended Chapter 12 Plan dated October 28, 2022 ("Amended Plan") (ECF No. 59) which is the plan under consideration for confirmation herein.  *See* Amended Scheduling Order (ECF. No. 69) (directing that "the First Amended Plan (ECF No. 59) will incorporate the terms of the Parties' agreed upon Joint Stipulation of Facts and serve as the plan under consideration at the rescheduled Evidentiary Hearing [on December 7, 2022]").

Objection to Confirmation.  The Amended Plan as modified by the Parties' Joint Stipulation of Facts (the "Joint Stipulation") (ECF No. 56) and on the record at the Hearing is hereby confirmed.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the Parties and subject matter of this core proceeding pursuant to 28 U.S.C. §§ 157(a), (b)(1), (b)(2)(G) and (L), and 1334(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND[4]

Debtors filed the present joint petition for chapter 12 relief on February 21, 2022 (the "Petition") (ECF No. 1), listing on Schedule A real properties known as 71, 111, 166, 170, and 310 Dutchtown Road, Town of Windsor, New York (collectively the "Property").  Between May 1998 and December 2007, Debtors executed several mortgages encumbering the Property in favor of NBT Bank ("NBT").[5]  On December 10, 2012, Debtors executed a promissory note with NBT in the sum of $1,640,794.21 ("Note I") and a second note in the sum of $874,674.14 ("Note II").[6] Thereafter, Debtors made monthly payments of $25,000 to NBT until August 2015, during which time milk prices dropped and Debtors were forced to reduce their payments to $14,500.[7]

---

[4] The facts are derived from the Joint Stipulation (ECF No. 56), the record of the Hearing, the Exhibits admitted into evidence at the Hearing (*see* ECF No. 74), the documents filed in this case and Debtors' previous bankruptcy cases including Case No. 16-60022, Case No. 16-60905, and Case No. 16-61636 which this Court takes judicial notice of pursuant to the Federal Rule of Evidence 201, and *In re House*, 2019 Bankr. LEXIS 156, at *2, n.1 (Bankr. S.D. Miss. Jan. 18, 2019) ("A court may take judicial notice of related proceedings and records in cases before the same court") (citation omitted).  Based on NG's Motion for Alternative Relief and allegations of bad faith regarding Debtors' serial filings, the Court considers the facts of the prior cases and pleadings filed therein relevant to its findings.

[5] NBT and Debtors entered into the following mortgages: (i) on May 1, 1998 a mortgage was executed in the amount of $160,000.00 ("Mortgage I") and was recorded on June 12, 1998; (ii) on June 3, 1998 a mortgage was executed in the amount of $83,000 ("Mortgage II") and was recorded on June 12, 1998; (iii) on November 20, 1998 a mortgage was executed in the amount of $100,000 ("Mortgage III") and was recorded on December 23, 1998; (iv) on May 26, 2005 a mortgage was executed in the amount of $750,000 ("Mortgage IV") and was recorded on June 2, 2005; (v) on November 1, 2002, a mortgage was executed in the amount of $200,000 ("Mortgage V") and was recorded on December 24, 2002; and (vi) on December 17, 2007 a mortgage was executed in the amount of $250,000 ("Mortgage VI") and was recorded on January 4, 2008 (collectively the "Mortgages").

[6] *See* Joint Stipulation, ¶¶ 7, 9, 11, 13, 15, 17.

[7] *See* Debtors' Affirmation in Opposition to Motion for Relief from Automatic Stay and Adequate Protection filed in Debtors' First Case. (Bankr. 16-60022 at ECF No. 18).

On January 7, 2016, Debtors filed a voluntary petition under chapter 12 of the Bankruptcy Code with Case No. 16-60022 ("First Case").  Approximately 2½ months later, NBT and Debtors agreed to an Interim Order for Debtors to pay NBT monthly adequate payments of $1,500.00 ("Interim Order").  Shortly thereafter, Mortgages I, II, III, IV, V and VI were transferred to NG and assignments were recorded.  Note I and Note II were simultaneously assigned and transferred to NG by allonges. On May 5, 2016, NG was granted relief from the automatic stay based on a default in the Interim Order.  Four days later, the Court granted the Trustee's motion to dismiss the First Case due to Debtors' failure to file and serve a notice of confirmation hearing.

On June 22, 2016, NG filed a summons and complaint against Debtors in the Supreme Court of the State of New York, County of Broome ("State Court"), seeking a judgment against Debtors in the amount of $1,496,187.92, and an Order of Seizure pursuant to New York Civil Practice Law and Rule ("CPLR") 7102.  This action prompted Debtors to file their second chapter 12 petition, Case No. 16-60905 ("Second Case").  Approximately six months into the Second Case, Debtors executed a Renewal and Modification Agreement in favor of NG ("Modification Agreement") whereby Debtors ratified and modified their obligations under the various Notes and Mortgages and confirmed NG's liens on the Property.  Debtors acknowledged the principal, interest and late fees were $1,249,510 on Note I and $1,527,718 on Note II.  The Modification Agreement required Debtors to execute a new mortgage in favor of NG on two Properties in the amount of $200,000 ("Mortgage VII") and required three separate monthly payments to NG.

Although Debtors filed a plan, based on discussions among the Parties, they voluntarily dismissed the Second Case on February 3, 2017, before confirmation.  As part of an agreement with NG, Debtors began making monthly payments of $3,000 per month, with an increase to $4,000 per month for July and August 2017 (Bankr. 18-61636 at ECF No. 109).  In February 2018,

NG paid Debtors' delinquent real property taxes in the amount of $65,567.63. Approximately two months later, the Parties entered an agreement for Debtors to sell 88.3 acres of their encumbered Property to a third party at a price of $1,750 per acre, for a total sale price of $154,525 ("2018 Partial Property Sale"). Debtors sold the real property as agreed and remitted the net proceeds to NG after the closing in August 2018.[8] On September 6, 2018, NG filed another summons and complaint in State Court, this time seeking a reduced judgment against Debtors in the amount of $558,495.34 and an Order of Seizure pursuant to CPLR § 7102. (Joint Stipulation, ¶ 30).

On December 7, 2018, Debtors filed their third chapter 12 petition, Case No. 18-61636 ("Third Case"). Debtors proposed a chapter 12 plan, but the Court found it unfeasible and confirmation was denied by Order dated February 6, 2020. (Bankr. 18-61636 at ECF No. 83). The Court granted the Trustee a Conditional Order of Dismissal which provided Debtors an opportunity to file and notice an amended chapter 12 plan. On March 13, 2020, NG filed a motion seeking to have Debtors' case dismissed pursuant to sections 1208(c)(1), (c)(5), and (c)(9), barring Debtors from refiling for one year under sections 105(a) and 349(a) or, in the alternative, granting NG *in rem* relief pursuant to section 362(d)(4). One month later, the Parties agreed that Debtors would sell their cattle and equipment, from which NG received $25,918.22. (*See* Joint Stipulation, ¶ 36). By Order dated May 5, 2020, the Court denied NG's motion; however, the Trustee's Motion to Dismiss was granted for failure to confirm a plan. (Bankr. Case No. 18-60636 at ECF Nos. 114 and 116).

The dismissal of the Third Case occurred during a global pandemic. From March 20, 2020, to August 31, 2021, New York State laws and Executive Orders prohibited the filing of residential

---

[8] The record does not reflect how much NG was paid under the Modification Agreement, or how long Debtors made those monthly payments to NG between the dismissal of the Second Case on February 3, 2017, and the filing of Debtors' subsequent bankruptcy approximately eighteen months later.

mortgage foreclosure actions due to the financial crisis created by COVID-19.  Upon the lifting of

the various moratoriums, NG filed a mortgage foreclosure action in State Court on October 7,

2021.  Debtors filed a Hardship Declaration seeking a stay of that action through January 15, 2022.

NG challenged the asserted claim of hardship and moved for an order lifting the stay.  The matter

was thereafter adjourned and on February 16, 2022, NG filed a motion to appoint a Referee to

compute the amount due under the Mortgages. Less than a week later, Debtors filed the instant,

fourth chapter 12 petition ("Fourth Case") (ECF No. 1).

The schedules filed in this Fourth Case reflect that Debtors no longer own cattle or farm

equipment (ECF No. 1 and Joint Stipulation, ¶ 45). Instead, Debtors' projected income is derived

from their modified farming operation.[9]  Debtors grow crops including corn, alfalfa, hay, and, in

some years, soybeans.  Additionally, Debtors now board and raise beef cattle, and receive income

from Chobani whey distribution.  Debtors also rent one of the Properties for $800 per month.

NG filed three proofs of claim in this case: Claim No. 2 is filed as a secured claim in the

amount of $1,398,825.95; Claim No. 3 is filed as a secured claim in the amount of $50,000.00 and

an unsecured claim in the amount of $587,681.58, for a total of $637,681.58; and Claim No. 4 is

filed as a secured claim in the amount of $101,174.05 and an unsecured claim in the amount of

$98,825.95, for a total of $200,000.00.  These claims have been addressed in the Amended Plan

as revised by the Joint Stipulation, ¶ 2, wherein the Parties agreed to value the Property and NG's

secured claim at $1,000,000 to be repaid with an interest rate of 8% (the "Stipulated Claim"), set

pursuant to *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).  At the Hearing, the Amended Plan was

orally modified to provide for an increase in plan payments to the Trustee of $8,621.00 for thirty-

six (36) months to pay the Stipulated Claim, administrative expenses and a small dividend to

---

[9] Exhibit A attached to the Amended Plan (ECF No. 59-1) contains updated projected income and expenses supported
by Debtor's testimony at the Hearing.

unsecured creditors, and for direct payments to continue to NG for months thirty-seven (37) through forty-eight (48), at which time the balance on the NG debt would be paid in full through a refinance.[10]

Notably, Debtors have paid the following school and county real property taxes: 2019 - $28,758.81; 2020 - $25,474.12; and 2021 - $26,892.24.  As of October 20, 2022, the combined county and school taxes due on the Property totaled $38,278.91.  (Joint Stipulation, ¶ 49).  By letter dated December 19, 2022, the Trustee confirmed that both he and NG supported Debtors' decision to pay their tax arrears "in full, with a lump sum" "directly to the County of Broome." Accordingly, the Trustee withdrew his objection to confirmation.  (ECF No. 79).  With the Trustee's issues resolved, only the Parties' competing positions are before the Court for determination.

At the Hearing, the Court heard the following testimony, observing and assessing the credibility of the four witnesses.  Debtor Kenneth Worden ("Debtor") testified Debtors made monthly payments of $25,000.00 on NBT's note for approximately ten years, for a total of approximately $3,000,000.  When dairy prices fell, coupled with costs associated with the floods of 2006 and 2011, Debtors could no longer manage their monthly payments to NBT and filed the First Case.  During this time NBT sold the note to NG.  Debtors dismissed the First Case because NG had expressed a willingness to work with them. (Trial Tr. 17–20).[11]  NG commenced an action seeking a judgment and order of seizure less than two months later and, in response, Debtors filed the Second Case to "protect" themselves and to prevent NG from foreclosing on the farm.  Debtors believed the filing was their "only option."  (Trial Tr. 24-25).  On January 26, 2017, the Parties

---

[10] During the Hearing, Edward J. Fintel, counsel for the Trustee, advised the monthly payment needed to be $8,621 for the Amended Plan to be feasible.  (Trial Tr. 121-122).

[11] The Trial Transcript is filed at ECF No. 77-1 and will be referred to herein as "Trial Tr. [page number]."

entered into the Modification Agreement ratifying and amending payment terms on the Notes and Mortgages.  As a result, Debtors voluntarily dismissed their Second Case.

NG subsequently paid $65,567 in real property taxes.  Debtors then sold 88.3 acres of real property and remitted approximately $155,000 in proceeds from that sale to NG.  After the closing and receiving payment, NG "called the note" and commenced a collection action in State Court approximately 30 days later.  (Trial Tr. 30-32).

In response to that action, Debtors filed their Third Case, and noticed a plan for confirmation. Debtors made payments of "roughly $5,800 a month, for six months, and then catchup taxes that were due."  In April 2020, NG and Debtors agreed that the cattle and farm equipment would be sold with all proceeds going to NG.  In May 2020, the Third Case was dismissed for failure to confirm a plan.  (Trial Tr. 33-36).

Presently, Debtors are parties to an agreement with Wormont Dairy dated May 15, 2022, under which Debtors raise and care for its cattle ("Cattle Contract").  Wormont Dairy is run by Debtor's brother, Charles Worden ("Charles").  Debtor testified the arrangement has "turned into a good thing because beef prices are strong right now, so [Charles] is able to pull out beef cattle on a monthly basis and sell them."  Debtors also grow crops consisting of "corn, hay, alfalfa and in some years soybean," part of which are used for feed with the excess sold.  (Trial Tr. 42-43).

Debtors' income and expenses as reflected on Exhibit A of the Amended Plan include revenue from shell corn sales, high energy corn sileage, the Cattle Contract, Chobani whey distribution, the house rental, the New York State tax refund, and Social Security income.[12]  Since the filing, there have been two changes to Debtors' cash flow as reflected therein.  The first is a price and head increase under the Cattle Contract pursuant to the amendment.  The original

---

[12] Patricia Worden's part-time employment income is listed as zero in the Amended Schedule A attached to the Amended Plan.

8

agreement provided for "200+ head of cattle at $1.50 per head per day." (NG Ex. C). At trial,

Debtor testified they were boarding about 265 head and that the brothers had agreed to raise the

daily rate per head from $1.50 to $1.65. In addition, the length of the Cattle Contract was extended

out until the NG note was paid. (Trial Tr. 49-54). Due to the increase in the number of cattle,

Debtor testified the income and expenses numbers "might shift somewhat" since Debtors were

feeding more cattle. Shell corn sales may decrease and be put into storage for the cattle; however,

the amount of sileage sold would increase. (Trial Tr. 58-60). The second change relates to Patricia

Worden leaving her part-time job to work on the farm with Debtor and the corresponding loss of

her wages. (Trial Tr. 44-48).

Debtor testified their expenses were estimated "as high as we figured it could possibly be,"

noting that the $3,000 per month cost associated with the Wormont Dairy Equipment Rental

Agreement (the "Equipment Agreement") (NG's Ex. D) is deducted from the monthly income

received for raising cattle each month. The personal household expenses include "food,

housekeeping, childcare, laundry, personal care, the dental, everything." Debtors also have

custody and care for their 11-year-old granddaughter. (Trial Tr. 61-66).

Charles testified that he has grown crops and raised cattle all his life, and that he has been

the sole owner of his farm since 1978. In 2017, Charles had a barn fire and lost his milking parlor,

his offices and everything at the dairy, and was "forced to move the cattle off the farm." (Trial Tr.

86). Prior to that incident, Charles had started to use sexed semen to breed feeder steers, which

"really changed the dynamics" of the farming operation due to the increased demand for beef after

a lot of calves were lost in "the storms in the Dakotas." (Trial Tr. 88-89). Due to the fire, he did

not have the space to house the cattle, and he and Debtor began discussing a joint operation. The

agreement for 200-plus head at $1.50 a pound, which dollar amount was "pretty standard," is

"driven off of what it costs to feed one and a little bit for overhead." (Trial Tr. 89). Debtor does not own any equipment, and the cost under the Equipment Agreement with Debtor "is built into the fee." (Trial Tr. 93). While both the Cattle Contract and Equipment Agreement are still in place, the Worden brothers recently agreed to increase the fee per head and the number of cattle raised. Debtor feeds the cattle the same diet young animals are fed, which is "much different than most" other farmers do, and it has "worked really well for us." (Trial Tr. 94-96). As a result, Charles is "getting a very high price for the cattle" because the unique diets are low-cost and result in a good profit margin. With the solid profit margins, Charles is comfortable with the feeding and care of the cattle so the number raised by Debtors has increased to 265 and may be further increased over time. (Trial Tr. 95-96).

Debtors' expert witness, Gary Conklin, is semi-retired and has worked as a part-time consultant for the Chapter 12 Trustee since 1996. Mr. Conklin visited Debtors' farm and wrote the Field Report in this case. (NG Ex. J). Mr. Conklin acknowledged the two changes to income and expenses supporting the Amended Plan, namely the new Cattle Contract terms with Wormont Dairy and the lack of income from Patricia Worden, but that based on "actual numbers," the Amended Plan was "reasonable." (Trial Tr. 102-104). Since Debtor and Charles have been in the cattle business all their lives, in his opinion "if there's anybody that can project what a dairy or beef herd is going to produce, it's probably these guys." (Trial Tr. 103). Further, if Debtors establish a "positive track record" of "making monthly payments on a timely basis" this will "enhance the[ir] possibility of getting refinanced." (Trial Tr. 103).

NG's expert, Bruce Dehm ("Mr. Dehm") is an agricultural economist who operates the consulting business "Dehm Associates," serving mostly dairy farms. He has worked with hundreds of farms since 1991. (Trial Tr. 106-108). He indicated he reviewed NG's exhibits, and

prepared NG's Exhibit O in advance of his testimony, which summarized his analysis of Debtors' income and expenses for the 11 months ending in November 2022.  This review resulted in a negative cash flow of $51,954. (Trial Tr. 112-118).  After recomputing the Amended Plan figures as discussed at the Hearing with an increase to 265 cattle at $1.65 per head per day, the removal of Ms. Worden's outside income, and an increase in the Amended Plan payments to $8,621 per month, Mr. Dehm calculated there would still be an annual negative cash flow of $2,845.  (Trial Tr. 162-164; 167-168).[13]  He further testified based on his experience "if you're adding cattle, there's going to be more expense" and expected increases in variable costs such as utilities, repairs and fuel.  (Trial Tr. 165-166).

ARGUMENTS[14]

In its Motion to Dismiss, NG argues this case should be dismissed for "cause" based on Debtors' bad faith serial filings.  Asserting that Debtors have no desire or ability to formulate or confirm a viable plan as demonstrated by the dismissal of the previous bankruptcy cases, NG alleges Debtors have not filed their chapter 12 cases in good faith, have exhibited a lack of effort in reorganizing, and that the factors in set forth in the Second Circuit's chapter 11 decision *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304 (2d Cir. 1997) support its section 1208 motion.  If the case is not dismissed, NG requests this Court grant relief from the automatic stay for cause under section 362(d)(4) for bad faith serial filings with *in rem* relief for

---

[13] Debtors' counsel filed the October Monthly Operating Report and November Monthly Operating Report the day before the Hearing.  The Court does not condone the "trial by ambush" approach but allowed Debtor's testimony regarding the November financial results.  Although unable to independently verify their accuracy, Mr. Dehm was able to competently testify regarding the figures contained therein.

[14] NG attempts to reargue its position in its Post-Trial Memorandum of Law that the testimony of fact witnesses Kenneth Worden and Charles Worden should be precluded at trial. Prior to the Hearing, the Court addressed that issue in a detailed Oral Ruling pursuant to Second Circuit case law and FRCP 16 and 37, made applicable to this bankruptcy proceeding by FRBP 7016 and 7037.  In analyzing the factors articulated in *Patterson v. Balsamico*, 440 F.3d 104 (2d. Cir. 2006), the Court determined they weighed in Debtors' favor, and against NG, which decision was So Ordered on November 21, 2022.  Thus, the testimony will be considered.  (*See* Amended Scheduling Order at ECF No. 69).

two years from the dismissal date, or in the alternative, grant NG relief from the automatic stay pursuant to sections 362(d)(1) and (d)(2) and Local Bankruptcy Rule 4001-1.

Debtors counter that the arguments in NG's Motion to Dismiss and Motion for Alternative Relief mirror those made in the Third Case, which were previously rejected by the Court. (Bankr. Case 18-61636 at ECF No. 114). Debtors contend NG continues to paint an incomplete picture of the Parties' relationship since NG purchased the loans from NBT in 2016, excluding facts and misinforming the Court of the Parties' history. Debtors aver that the dismissal of Debtors' First and Second Cases were at the behest of NG so that the Parties could work out their issues. This arrangement included liquidating Debtors' dairy herd to raise beef cattle, as well as making good faith payments to NG by selling off their best tillable land and remitting all proceeds from the sale to NG. Debtors therefore ask this Court to find that the Fourth Case was filed in good faith and deny NG's Motion to Dismiss and Motion for Alternative Relief in their entirety.

NG's Objection to Confirmation focuses on Debtors' lack of supporting documentation which prevents this Court from assessing whether they will be able to make all payments under the Amended Plan as required by section 1225(a)(6). NG asserts Debtors' only documents concern the cattle boarding and the equipment rental, which are suspect since the agreements are between Debtor and his brother. Debtor's newly created income from amendments to the Cattle Contract were conveniently created to support the Amended Plan while Debtors' past filings, performance and historical operating reports demonstrate it is not feasible. Further, NG claims that although certain line items provide for income from "Shell Corn Sales" and "Chobani Whey Distribution," no documentation to support receipt of revenue from those aspects of their farming operation was provided. Thus, NG asserts Debtors have failed to carry their burden and the Court should deny confirmation.

In turn, Debtors contend that the Projected Income and Expenses attached to the Amended Plan demonstrate their ability to fund the Amended Plan as modified on the record at the Hearing. Since Kenneth Worden's detailed testimony of income and expenses was not controverted by NG during cross-examination or through NG's examination of its expert witness, Debtors submit they have shown feasibility and the Amended Plan should therefore be confirmed.

DISCUSSION

The Court will first address NG's argument for dismissal for bad faith under section 1208(c) and requests for relief from the automatic stay pursuant to sections 362(d)(1), (2), and (4). Finally, the Court will discuss the Objection to Confirmation, and assess the feasibility of Debtors' Amended Plan.

A. Section 1208(c) Dismissal for Cause: Bad Faith

In its Motion to Dismiss, NG claims that Debtors' case should be dismissed with prejudice pursuant to 11 U.S.C. § 1208(c) due to Debtors' bad faith filing of the Petition. Section 1208(c) provides that "[o]n request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter for cause…" and provides a nonexclusive list of ten grounds on which a court may find cause. 11 U.S.C. § 1208(c); *see Snider v. Rogers (In re Rogers)*, Case No. 17-21187, 2018 Bankr. LEXIS 187, at *8-9 (Bankr. W.D.N.Y. Jan. 25, 2018); *In re Hyman*, 82 B.R. 23, 24 (Bankr. D.S.C. 1987); *In re Galloway Farms, Inc.*, 82 B.R. 486, 489 (Bankr. S.D. Iowa 1987). Although not specifically listed in the statute, "[e]vidence of a bad faith filing constitutes cause for dismissal pursuant to § 1208(c)." *In re Burger*, 254 B.R. 692, 696 (Bankr. S.D. Ohio 2000). "Bankruptcy courts…routinely treat dismissal for prepetition bad faith conduct as implicitly authorized by the words 'for cause'." *Marrama v. Citizens Bank*, 549 U.S. 365, 373 (2007).

NG contends the bad faith analysis in the Second Circuit's chapter 11 decision *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304 (2d Cir. 1997) is dispositive in this Chapter 12 case.  NG argues that courts in this Circuit have applied the *C-TC* factors to allegations of bad faith in Chapter 13 cases and, because of the similarity between chapter 13 and chapter 12, those factors should be applied here.  NG cites several cases in which the *C-TC* elements were used in the Chapter 13 context by the bankruptcy court, which decisions were subsequently affirmed by the district court.  *See Newton v. BNH Five Pack LLC (In re Newton)*, 17CV6379, 2020 U.S. Dist. LEXIS 91448, at 23 (S.D.N.Y. 2020) (affirming Bankruptcy Court's grant of *nunc pro tunc* relief from the automatic stay in debtor's third chapter 13 case for bad faith filing); *In re Jean-Francois*, 516 B.R. 699 (E.D.N.Y. 2014) (affirming Bankruptcy Court's grant annulling stay for bad faith filing using *C-TC* factors but without citing to the case); *Koutsagelos v. PII SAM, LLC*, 12CV1703, 2013 U.S. Dist. LEXIS 83418, at 12 (E.D.N.Y. 2013) (affirming Bankruptcy Court's grant of *nunc pro tunc* relief from the stay for bad faith filing under section 1325(a)(3)); *Plagakis v. Gelberg (In re Plagakis)*, 03CV0728, 2004 Dist. LEXIS 2458, at *16 (E.D.N.Y. 2004) (affirming Bankruptcy Court's dismissal of chapter 13 case *nunc pro tunc* to filing date).  While *Plagakis* is the only case to address a section 1307(c) motion to dismiss, these decisions demonstrate that courts in this Circuit find the *C-TC* bad faith factors applicable to chapter 13 cases.

In its post-trial submission, NG relies on the *C-TC* factors in the chapter 12 context citing the Virginia case of *In re Massie,* 231 B.R. 249 (Bankr. E.D. Va. 1999).  The *Massie* court reviewed the *C-TC* elements and concluded that case should be dismissed.  This outcome however, was based upon vastly different circumstances than exist here.  The *Massie* debtor was being evicted through a state court unlawful detainer action after her mother had already lost ownership

of the farm property at issue.  She had no income and virtually no other creditors, and the court

concluded "[o]bjectively, reorganization would be futile as she had nothing to reorganize*." Id.* at

253.  Moreover, the *Massie* debtor acknowledged on several occasions that she knew she did not

qualify as a chapter 12 debtor.  *Id.*  As a result, the court concluded she filed her petition in bad

faith.  *Id.* at 254.

The only case in the Second Circuit that tangentially involved chapter 12 was not directly

on point, as the *C-TC* factors were discussed in a subsequently filed chapter 11 case.  *In re Ridge*

*View Farm, LLC*, Case No. 12-31700, 2012 Bankr. LEXIS 5716 (Bankr. N.D.N.Y. Dec. 10, 2012).

There, the debtor had filed two chapter 12 cases that were dismissed and then filed a chapter 11

case.  One creditor brought a motion to dismiss the chapter 11 proceeding for lack of good faith,

while another creditor moved to reopen one of the previously dismissed chapter 12 cases to modify

an order terminating the stay to include *in rem* relief.  In analyzing the debtor's filing of the pending

chapter 11 matter, the court considered the debtor's actions in the previous two chapter 12 cases,

found seven (7) of the eight (8) *C-TC* bad faith factors present, and dismissed the case.  *Id.* at *22-

24.

Although the *Ridge View* court considered the prior Chapter 12 filings as part of its *C-TC*

bad faith analysis, this Court is unaware of any decisions in this Circuit that directly applied the

*C-TC* factors to a chapter 12 proceeding.  Accordingly, this case is a matter of first impression.

Mindful of the fact that chapter 12 debtors have always been afforded special consideration by

Congress, the involuntary nature of section 1208(c) relief being requested by NG is more fully

appreciated against the history behind chapter 12.  Accordingly, the Court's analysis begins with

a brief overview of its background.

"Farmers have long enjoyed favored status in America's bankruptcy laws."  Katherine M. Porter, Phantom Farmers: Chapter 12 of the Bankruptcy Code, 79 AM. BANKR. L.J. 729, 730 (2005) (discussing the history of chapter 12 and advocating for the development of broadly applicable economic initiatives to assist rural families).  Specialized bankruptcy relief for family farmers has existed for two decades.  Chapter 12 was first enacted on a temporary basis as part of the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, and a series of extensions followed to keep chapter 12 alive. *Id.* at 731-32, nn.14 & 15.  Chapter 12 is rehabilitative in nature and was initially designed as a more workable vehicle to overcome perceived problems with farmers' potential reorganization under either chapter 11 or chapter 13. *Id.* at 732 n.19 (citation omitted); *see also* Ralph A. Peeples, Staying In: Chapter 11, Close Corporations and the Absolute Priority Rule, 63 AM. BANKR. L.J. 65, 103 (1989) (noting "[t]he sparse legislative history indicates that chapter 12 was intended to make bankruptcy a more workable alternative for family farmers.").  The aim of Congress was to give family farmers a "fighting chance" to keep their land and to return to full-time farming after reorganizing. Porter, 79 AM. BANKR. L.J. at 734; *Harmon v. United States ex rel. FMHA*, 101 F.3d 574, 584 (8th Cir. 1996) (quoting H.R. Conf. Rep. No. 99-958, at 48 (1986), reprinted in 1986 U.S.C.C.A.N. at 5251-52).  With the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which became effective on October 17, 2005, chapter 12 became a permanent part of the Code. Through BAPCPA, Congress changed chapter 12 to again improve the ability of family farmers to successfully reorganize.  Porter, 79 AM. BANKR. L.J. at 733.  In the spirit of assisting rural families, which is the ultimate and singular goal of chapter 12, Congress gave creditors far less control in a Chapter 12 case than they would have in a chapter 11 case. *Id.* at 732.  "Compared to Chapter 11, a creditor in a Chapter 12 case has relatively few tools at its

disposal to derail a debtor's efforts to reorganize." *Id.* at 743.  Although Congress sought to ease

the burdens of family farmers who found bankruptcy to be their only option, it "also intended to

prevent abuse of the bankruptcy system and to ensure farm creditors [would] receive fair debt

repayment treatment."  *In re Pianowski*, 92 B.R. 225, 232 (Bankr. W.D. Mich. 1988) (quoting

H.R. Conf. Rep. No. 99-958, 99th Cong., 2d Sess. 48 (1986)).  "Once triggered, Code § 1208

ensures that a Chapter 12 debtor's conduct in connection with his or her case at all times comports

with the universally applied threshold requirement that he or she deal honestly and openly with

the Court and all creditors."  *In re Nichols*, 447 B.R. 97, 107-08 (Bankr. N.D.N.Y. 2010).

Against this backdrop the Court turns to *C-TC* and the Second Circuit's factors used to

determine bad faith in the filing of a petition.  To establish bad faith, the movant must satisfy a

two-pronged test by a preponderance of the evidence.  First, the movant must demonstrate the

objective futility of the reorganization process such that at the time of filing there was "no

reasonable probability that [the debtor] would eventually emerge from bankruptcy proceedings."

*In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991) (citation omitted).  Second,

in demonstrating subjective bad faith, the movant must show that there "was no reasonable

likelihood that the debtor intended to reorganize."  *Id.*  The Second Circuit noted that "a

determination of bad faith requires a full examination of all the circumstances of the case; it is a

highly factual determination but also one that may sweep broadly."  *C-TC*, 113 F.3d at 1312; *see*

*Squires Motel, LLC v. Gance*, 426 B.R. 29, 34-36 (Bankr. N.D.N.Y. 2010).  In making this

assessment, the Court considered whether: (1) the debtor has only one asset; (2) the debtor has few

unsecured creditors whose claims are small compared to those of secured creditors; (3) the debtor's

one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4)

the debtor's financial condition is, in essence, a two-party dispute between the debtor and secured

creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal and real estate taxes; and (8) the debtor has no employees. *C-TC*, 113 F.3d at 1311 (citing *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.* 139 B.R. 828 (W.D. Ky. 1992)).

Several of the *C-TC* factors support NG's assertion of bad faith in this case. Debtors' only asset is the Property[15] and there are no unsecured claims. The Property was subject to a foreclosure action as a result of arrearages and the dispute with NG could be resolved in the pending State Court action. The timing of the filings clearly delayed NG's enforcement efforts.

But those facts do not tell the whole story. Debtors have multiple sources of revenue derived from raising cattle, producing crops, distributing whey, and rental income. They have business agreements with Wormont Dairy and Chobani. Debtors have met their ongoing expenses, making large payments on real estate taxes that are current. While Debtors technically do not have employees, both of them work full time on the farm. Those factors weigh heavily against a finding of bad faith.

In a traditional Chapter 12 analysis, courts consider other relevant facts and agree that no one factor should be viewed as a dispositive indication of a debtor's good faith. *In re Pertuset*, No. 12-8014, 2012 Bankr. LEXIS 5792, at *41 (B.A.P. 6th Cir. Dec. 18, 2012); *In re Ryder Farms*, Case No. 02-3201, 2002 Bankr. LEXIS 2034, at *22 (Bankr. S.D. Iowa 2002); *In re Girdaukas*, 92 B.R. 373, 377 (Bankr. E.D. Wis. 1998). These factors include: (1) the likelihood that much of the debt may be nondischargeable in Chapter 7; (2) the adverse impact on creditors of the debtor's

---

[15] Notably, Debtors owned other assets such as cattle and equipment until they were sold with the proceeds paid to NG.

actions in dissipating substantially all assets in the weeks leading up to filing; (3) the debtor's refusal to be forthcoming with the Court, the Trustee, and creditors concerning assets, liabilities, and prospects for reorganization; (4) the debtor's apparent lack of sincerity in seeking bankruptcy relief; and (5) the immovable impediment to ever confirming a plan created by the debtor's invocation of the Fifth Amendment privilege. *Snider v. Rogers (In re Rogers)*, No. 17-21187, 2018 Bankr. LEXIS 187, at *10 (Bankr. W.D.N.Y. 2018) (citing *Pertuset*, 2012 Bankr. LEXIS 5792, at *43). "Courts should also consider whether the debtor concealed assets, has been evasive toward the court and creditors, violated the Bankruptcy Code, or violated court orders. Evasion includes the failure to provide honest and complete information concerning financial affairs. . . ." *Ryder Farms*, 2002 Bankr. LEXIS 2034, at *22-23.

The timing and number of serial filings are an important element of any bad faith assessment. There is no *per se* rule against successive filings and a *bona fide* change in circumstances may justify a debtor's multiple filings. *In re Metz*, 820 F.2d 1495, 1498 (9th Cir. 1987); *Johnson v. Vanguard Holding Corp. (In re Johnson)*, 708 F.2d 865, 868 (2d Cir. 1983); *In re Dupuy*, 308 B.R. 843, 850 (Bankr. E.D. Tenn. 2004). In addition, bad faith is not necessarily construed simply because a debtor files for bankruptcy on the eve of foreclosure; such conduct may be "probative" of bad faith when it has happened repeatedly with the same creditor. *In re Glenn*, 288 B.R. 518, 520 (Bankr. E.D. Tenn. 2002).

The Court's inquiry into the propriety of Debtors' successive filings for purposes of dismissal for "cause" necessarily involves the question of bad faith since it examines whether there was a pattern or strategy behind those filings to frustrate statutory requirements and abuse the bankruptcy process. *In re McDermott*, 78 B.R. 646, 651 (Bankr. N.D.N.Y. 1985). Here, the Court observed the demeanor and candor of Debtor at the Hearing and is satisfied that Debtors intended

to reorganize and had a reasonable probability they would emerge from the bankruptcy proceeding in each of the prior cases. *See In re Sletteland*, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001). The Court believes Debtors did not invoke bankruptcy protections for an illegitimate purpose and have currently proposed the Amended Plan in good faith, without improper intent. Debtor answered all questions at the Hearing straightforwardly and honestly. There are no allegations that Debtors have concealed assets or been evasive toward the Court, the Trustee, or NG, or that they dissipated assets shortly before filing. Debtors have been forthcoming with information and cooperated in the administration of the case by attending the 341 meeting of creditors, filing monthly operating reports and providing documents, and have not violated court orders. *See Rogers*, 2018 Bankr. LEXIS 187, at *4-5 (finding debtor's refusal to testify at the meeting of creditors as to matters directly relating to the bankruptcy filing, and refusal to provide documents relating to the business support for dismissal). Considering all the circumstances, Debtors possess a proper business purpose for filing this case. The Court finds the following considerations pertinent to its conclusions.

Since 2016, Debtors have demonstrated their good faith effort to pay down their secured debt. When NBT sold the debt to NG, Debtors believed that it was necessary to voluntarily dismiss the First Case to be able to work with NG. While such belief was mistaken, it was understandable.[16] Approximately 1½ months later, NG commenced a State Court collection action seeking a judgment of $1,496,187 and an order of seizure, prompting Debtors to file their Second Case on June 25, 2016. During the Second Case, Debtors executed the Modification Agreement in favor of NG. (NG's Ex. I, Motion for Alternative Relief).[17] When that proceeding was

---

[16] NG did not have a representative testify at the Hearing as to any of the allegations in the Motion to Dismiss, Motion for Alternative Relief or the Objection to Confirmation.

[17] The docket in the Second Case does not reflect the Court approved the Modification Agreement.

voluntarily dismissed, NG paid $65,567.63 of real property taxes on behalf of Debtors (Joint Stipulation, ¶ 27) and the Parties agreed Debtors would sell approximately 90 acres of real property, from which NG received $154,525 in proceeds. According to Kenneth Worden, "the check went to them and first thing that it covered was reimburse them for the taxes that they'd paid." (Trial Tr. 27-28; Joint Stipulation, ¶¶ 28 and 29).

After the dismissal of the Second Case, Debtors commenced making monthly payments to NG of between $3,000 to $4,000 per month. While unclear how much Debtors paid NG during the intervening eighteen (18) month period, when NG commenced another State Court action on September 6, 2018, it sought a significantly reduced judgment in the amount of $558,495.34. Debtors' payments and corresponding reduction in debt do not escape the Court as relevant to the bad faith analysis here.

Three months after the State Court action was filed, Debtors filed their Third Case and a proposed chapter 12 plan. NG sought relief from the automatic stay under sections 362(d)(1), (d)(2), and (d)(4). Debtors responded by asserting that the motion misrepresented or misconstrued Debtors' commercial relationship with NG. NG then filed an objection to Debtors' proposed plan. Meanwhile, NG received adequate protection payments, and took an order on its original motion for relief from stay. Subsequently, and after obtaining stay relief, NG filed a motion for *in rem* relief, which sought, *inter alia*, to bar Debtors from refiling for one year and/or asking that the section 362(a) stay would not apply if Debtors filed any subsequent bankruptcy case for a period of one year. (Bankr. 18-61636 at ECF No. 102). After conducting a hearing, the Court denied NG's requests for *in rem* relief and dismissal with prejudice, (Bankr. 18-61636 at ECF No. 114) and granted the Trustee's motion to dismiss. (Bankr. 18-61636 at ECF No. 116). As a result of the COVID-19 pandemic, all was quiet until Debtors filed this Fourth Case.

Debtor credibly testified that based on communications with NG, it was Debtors' understanding that there would be a systematic sale of farm property, minus a carve out for them to continue running a small farming operation. Debtors sold collateral and real property and remitted all proceeds to NG.[18] While NG asserts Debtors failed to obtain its written approval pursuant to the Modification Agreement, NG accepted the proceeds and, in this Court's view, tacitly agreed to the arrangement per the Parties' discussions. Unlike the debtor in *Snider* who dissipated substantially all assets just before filing, Debtors sold their assets with NG's imprimatur. Additionally, Debtors have fully cooperated in the administration of their case and demonstrated a sincere desire to reorganize. Considering these factors and taking into account the change in Debtors' circumstances since their Third Case, Debtors appear to be gaining traction towards rehabilitation and thus should be afforded their "fighting chance." Based on the above, NG has not demonstrated objective futility in the reorganization process such that on the Petition date "there was no reasonable probability that [the debtor] would eventually emerge from bankruptcy proceedings" as required in this Circuit. *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991) (citation omitted); *In re Anderson*, 631 B.R. 417, 423 (Bankr. S.D. Ohio 2021) (sufficient explanation for progression of successive cases avoided conclusion of bad faith). Likewise, NG failed to demonstrate subjective bad faith and show there "was no reasonable likelihood that the debtor intended to reorganize." *Id.*

A dismissal for bad faith under section 1208(c) seeks to prevent dishonest and ill-motivated debtors from invoking the protections of bankruptcy altogether. Keeping in mind Congress's

---

[18] Debtor's uncontroverted testimony indicates that they were willing to sell all farmland except for the tenant house and 50 acres to be able to "run a few beef cattle." (Trial Tr. 32). Since Debtors were amenable to selling the farmland under section 363, a sale remains an option for Debtors. As one court acknowledged, "[t]he real test still remains the presence of honest intention of Debtor and some real need and real ability to effectuate the aim of the reorganization, even if this involves total liquidation of assets." *In re North Redington Beach, Assocs., Ltd.*, 91 B.R. 166, 169 (Bankr. M.D. Fla. 1988).

intention to encourage the rehabilitation of family farmers and after fully examining all the circumstances before it, this Court concludes Debtors are not the type Congress intended be punished under that section.  Accordingly, this Court finds Debtors' Fourth Case was not filed in bad faith and denies NG's Motion to Dismiss.

    B. Section 362(d): Relief from the Automatic Stay

    Having determined this case was not filed in bad faith, the Court now turns its attention to NG's Motion for Alternative Relief and requests for stay relief for cause under sections 362(d)(1), (d)(2) and (d)(4).  Section 362(d)(1) provides in relevant part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest…

11 U.S.C. § 362(d)(1).

    The creditor bears the initial burden of showing that it is entitled to relief for cause under this subsection.  "The statute does not define 'cause,' so courts must determine whether cause exists based on the totality of the circumstances of each case." *In re Magnale, LLC*, No. 17-61344, 2018 Bankr. LEXIS 4232, at *18 (Bankr. N.D.N.Y. Feb. 8, 2018) (citing *United States v. Olayer (In re Olayer)*, Case No. 17-23386-GL, 2017 Bankr. LEXIS 4045, at *9 n.58 (Bankr. W.D. Pa. Nov. 22, 2017)).  "Once the creditor does so, the burden shifts to the debtor to show that the creditor's interest is adequately protected." *Magnale,* 2018 Bankr. LEXIS 4232, at *18; 11 U.S.C. § 362(g).

    NG asserts Debtors' failure to make post-petition payments constitutes "cause" to modify the automatic stay and is "one of the best examples of a lack of adequate protection" under section

362(d)(1), relying on *In re Taylor*, 151 B.R. 646, 648 (E.D.N.Y. 1993). This reliance is misplaced, as that case involved a Chapter 13 debtor who failed to make post-confirmation payments.[19] (*See* ECF No. 10). Moreover, unlike Chapter 13 debtors' statutory obligations under section 1326(a) to commence making payments not later than 30 days after the date of the filing of the plan or the order for relief, Chapter 12 debtors are not required to make any such payments under section 1226. "The language of section 1226(a), although not requiring pre-confirmation payments, does not state that a bankruptcy court is powerless to order such payments… the bankruptcy court [has] the power pursuant to 11 U.S.C. § 105(a), to order pre-confirmation plan payments." *Stahn v. Haeckel*, 920 F.2d 555, 557-58 (8th Cir. 1990).

In accordance with that authority, by Order entered May 4, 2023, this Court directed Debtors to make monthly adequate protection payments to NG beginning on May 15, 2023. (ECF No. 93). Given that mandate and the pending confirmation of an Amended Plan that will pay NG its $1,000,000 Stipulated Claim with 8% interest, the Court finds cause does not exist to warrant stay relief under section 362(d)(1).

NG also requests relief under section 362(d)(2) which authorizes relief with respect to a stay of an act against property under subsection (a) of this section, if-

> (A) the debtor does not have an equity in such property; **and**
> (B) such property is not necessary to an **effective reorganization**…

11 U.S.C. § 362(d)(2) (emphasis added).

Once the debtor's lack of equity in the collateral has been demonstrated, the burden shifts to the debtor to prove that the property is "necessary to an effective reorganization." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988); *In re MHS*

---

[19] NG also cites a chapter 7 case of *In re Sterling,* 2018 Bankr. LEXIS 18* (Bankr. S.D.N.Y. 2018), where no reorganization was contemplated, and a liquidating debtor failed to make post-petition mortgage payments.

*Mgmt. Grp., LLC*, Case No. 08-63116, 2009 Bankr. LEXIS 3580, at *13 (Bankr. N.D.N.Y. Oct. 26, 2009) (citing *In re 266 Washington Assocs.*, 147 B.R. 827, 829 (E.D.N.Y. 1992)); *see In re East/Alexander Holdings, LLC*, Case No. 22-20151-PRW, 2022 Bankr. LEXIS 1367, at *6-7 (Bankr. W.D.N.Y. May 12, 2022); *In re St Maarten*, Case No. 18-41215, 2019 Bankr. LEXIS 4007, at *7 (Bankr. E.D.N.Y. May 24, 2019).

As movant, NG again bears the burden of establishing that Debtors lack equity in the Property covered by its secured claim. *See* 11 U.S.C. § 362(g)(1). A debtor has no equity in its property when the debts secured by liens on the property exceed the property's value. *East/Alexander Holdings*, 2022 Bankr. LEXIS 1367, at *6-7 (citing *In re Manning*, 620 B.R. 199, 205 (Bankr. W.D.N.Y. 2020) (Warren, J.); *In re Elmira Litho, Inc.*, 174 B.R. 892, 900-01 (Bankr. S.D.N.Y. 1994)). The value of the property relevant to a court's consideration of whether to grant stay relief is the property's value as of the date of the hearing on the motion for relief from stay. *Id.* at *6-7 (citing *In re Windham Mills Dev. Corp.*, Case No. 04-23619, 2008 Bankr. LEXIS 1126, at *7 (Bankr. D. Conn. Apr. 8, 2008)). In this case, the Joint Stipulation acknowledged Debtors have no equity in the Property at the time of commencement of this case and continuing through October 2022, satisfying the first prong of section 362(d)(2). (*See* Joint Stipulation, ¶ 46).

Debtors must then demonstrate "that the collateral at issue is 'necessary to an effective reorganization.'" *Timbers*, 484 U.S. at 375. "Under § 362(d)(2)(B), the test of whether property is 'necessary to an effective reorganization,' as articulated by *Timbers*, is a two-part test: (1) whether the property is needed for the execution of the Debtors' plan, and (2) whether the Debtors' proposal amounts to a plan "that is in prospect." *In re Simpson*, Case No. 17-10442, 2018 Bankr. LEXIS 1211, at *25 (Bankr. D. Vt. 2018); *see Versus Bank of Commerce v. Fox (In re Fox)*, Case No. 12-32462, 2013 Bankr. LEXIS 653, at *9-10 (Bankr. D. Colo. 2013). "What an 'effective

reorganization that is in prospect' means is that 'there must be a reasonable possibility of a successful reorganization within a reasonable time.'" *Id.* (quoting *Timbers*, 484 U.S. at 375-76).

It is undisputed that Debtors' farm operations are located on the Property where Debtors raise beef cattle and grow crops. The testimony established Debtors' primary sources of income needed for plan execution are derived from that Property. Thus, the first part of the *Timbers* test is easily satisfied.

The more difficult inquiry is whether Debtors' Amended Plan is "in prospect." NG argues that there is no reasonable possibility of a successful reorganization within a reasonable time, highlighting that Debtors had five years since the first Chapter 12 filing in 2016, their previous proposals for a feasible plan failed, and "their financial situation has gotten significantly worse over time." (ECF No. 10). Debtors' previous performance did not support the proposed reorganization, and any alleged increases in income from the Cattle Contract amendment should not be considered since it was never introduced or admitted into evidence. It was undisputed that prior to the change in terms, Debtors were not boarding the maximum number of cattle and in some months the figures indicate that the head of cattle went to a low of 97 head. (Trial Tr. 158). According to NG, "Debtors provided no explanation for their sudden miraculous ability to increase their cattle boarding ability by over 53% to 265 head[,]…[and that] Debtors could also claim they increased the head of cattle, as well as the dollar amount per head, because the cattle raising contract was between the Debtor and the Debtor's brother." (ECF No. 80, p. 23). Without verification, there is "every incentive for the Debtor to conveniently 'adjust' the number of head of cattle and the dollar amount per head to whatever figures would work to support their proposed plan." (ECF No. 80, p. 18).

The Court rejects NG's arguments and finds the testimony of Debtor and his brother Charles about the changes to the Cattle Contract to be credible.[20]  While a written copy of the amendment was not submitted into evidence, the Court may determine that oral testimony alone is sufficient.  *See Sanders v. Monsanto Co.*, 574 F.2d 198, 200 (5th Cir. 1978) (stating in *dicta* "[h]istorical experience has taught us that testimonial evidence has the highest reliability because the credibility of the witness can be evaluated, and the factual issues narrowed by cross-examination").  Here, Debtor provided direct evidence of personal knowledge of the revised contract terms so that no other evidence needs to be presented.  *Sylvester v. SOS Children's Vills. III., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) ("direct testimony by a witness about a matter within his personal knowledge . . . does not require drawing an inference from the evidence . . . to the proposition that it is offered to establish").

The increases in income from the amended terms of the Cattle Contract are also reflected in the November Monthly Operating Report, of which the Court took judicial notice. (Trial Tr. 56).  After the Hearing, Debtors filed monthly operating reports for December 2022 to May 2023 which show that they will have sufficient net income to fund the Amended Plan.[21]  Debtor's plan payments of $8,621 per month as proposed at the Hearing therefore appear to be "in prospect."  *See Timbers*, 484 U.S. at 376.  As a result, the Court finds Debtors have demonstrated a reasonable possibility of a successful reorganization within a reasonable time, satisfying their burden to show the Property is necessary for reorganization and defeating NG's request for stay relief under 11 U.S.C. § 362(d)(2)(B).  *See id*.

---

[20] In New York, a contract may be modified "by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (quoting *CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 613 N.E.2d 159, 162, 597 N.Y.S.2d 284 (N.Y. 1993)).

[21] The January Monthly Operating Report (ECF No. 86) showed negative cash flow as a result of payment of the real estate taxes.

As a final request in the Motion for Alternative Relief, NG seeks stay relief under 11 U.S.C.

§ 364(d)(4) with *in rem* protections so that the stay will not be reimposed against the Property if

Debtors were to file a new bankruptcy case in the next two years. Section 362(d)(4), as enacted

by BAPCPA, Pub. L. No. 109-8, and amended by the Bankruptcy Technical Corrections Act of

2010, Pub. L. No. 111-327, provides in relevant part:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
> * * *
>
> (4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either -
> (A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or
> (B) multiple bankruptcy filings affecting such real property.

11 U.S.C. § 362(d)(4).

"This provision gives the Court authority to grant *in rem* relief from the stay as to Debtor's

interest in the Property, such that any and all future filings by any person or entity with an interest

in the Property will not operate as an automatic stay for a period of two years after the date of the

entry of such order, provided that the order is recorded in compliance with applicable state laws

governing notices of interest and liens in real property." *Magnale*, 2018 Bankr. LEXIS 4232 at

*21 (citing *In re Montalvo*, 416 B.R. 381, 386 (Bankr. E.D.N.Y. 2009)); 11 U.S.C. § 362(d)(4).

"Section 362(b)(20) creates a specific exception for the enforcement of a lien against or security

interest in real property following the entry of a § 362(d)(4) order in a prior bankruptcy case

prohibiting the application of the stay as to that property. 11 U.S.C. § 362(b)(20)." *Id.* "The

purpose of the two year bar under § 362(d)(4) is to prevent parties from filing another bankruptcy

case to reimpose the stay and frustrate secured creditor's enforcement rights." *Id.* (quoting *In re*

*Wilson*, 2017 Bankr. LEXIS 3781, at *4 (Bankr. W.D. Ky. Nov. 1, 2017) (citing 11 U.S.C. § 362(b)(20); *In re Alakozai*, 499 B.R. 698 (B.A.P. 9th Cir. 2013))).  The creditor bears the burden of proof to show that it is entitled to *in rem* relief under this provision. *Magnale*, 2018 Bankr. LEXIS 4232, at *21-22. (citing *United States v. Olayer (In re Olayer)*, 577 B.R. 464, 468 n.32 (Bankr. W.D. Pa. 2017)).

"In order to appropriately grant *in rem* relief, the record must clearly demonstrate an abuse of the bankruptcy process through multiple filings with the sole purpose of frustrating the legitimate efforts of creditors to recover their collateral." *In re Price*, 304 B.R. 769, 773 (Bankr. N.D. Ohio 2004).  "Although courts may no longer place undue reliance on the fraud element following the 2010 amendment, they will likely continue to require a substantial showing by the moving party before granting *in rem* relief." *In re McKenzie*, Case No. 19-10130, 2019 Bankr. LEXIS 906, at *5-6 (Bankr. S.D.N.Y. Mar. 25, 2019) (quotation omitted).  To obtain stay relief under section 362(d)(4), the creditor must prove that (1) the Debtor engaged in a scheme, (2) the object of the scheme is to delay, hinder or defraud the creditor, and (3) the scheme involved either a transfer of property without Movant's consent or court approval, or multiple filings affecting the Premises.  *See* 11 U.S.C. § 362(d)(4); *McKenzie*, 2019 Bankr. LEXIS 906, at *5 (quoting *In re Lee*, 467 B.R. 906, 920 (B.A.P. 6th Cir. 2012)).  Because the statute's remedy is extreme, "[t]he language [in § 364(d)(4)] was deliberately chosen by Congress to impose a substantial burden of proof on secured creditors…."  3 Collier on Bankruptcy, ¶ 362.05[19][a].

To succeed on its request for stay and *in rem* relief under § 362(d)(4), NG must make a *prima facie* showing that the instant case is part of a scheme to hinder, delay, or defraud it.  This Fourth Case, as with Debtors' previous cases, was filed as a means of stopping NG's foreclosure and replevin actions.  In certain circumstances, "[f]iling a bankruptcy petition as a means of

stopping a state foreclosure on real property qualifies as a plan to hinder or delay a creditor's rights to property." *In re Wilson*, Case No. 17-10770, 2017 Bankr. LEXIS 3781, at *4 (Bankr. W.D. Ky. Nov. 1, 2017) (citing *In re McKanders*, 42 B.R. 108, 109 (Bankr. N.D. Ga. July 17, 1984)).  It is well settled that the Court may "'infer an intent to hinder, delay, or defraud creditors from the fact of serial filings' alone, without holding an evidentiary hearing." *In re Richmond*, 513 B.R. 34, 38 (Bankr. E.D.N.Y. 2014) (quoting *In re Procel*, 467 B.R. 297, 308 (S.D.N.Y. 2012)).  "The extent of the efforts by a debtor to prosecute his bankruptcy case and '[t]he timing and sequencing of the filings' are important factors in determining whether a debtor has engaged in 'a scheme to delay, hinder, and defraud.'" *Richmond*, 513 B.R. at 38 (quoting *In re Montalvo*, 416 B.R. 381, 387 (Bankr. E.D.N.Y. 2009)).  When "debtors have exhibited a lack of effort in their bankruptcy proceedings and have instead engaged in serial filings to thwart the efforts of secured creditors exercising their rights under state law, courts have found that these serial filings are evidence of bad faith and abuse of the bankruptcy process." *McKenzie*, 2019 Bankr. LEXIS 906, at *3 (citations omitted).

Notwithstanding the negative inference the Court may draw from Debtors' serial filings, the record does not clearly demonstrate they abused the bankruptcy process with the sole purpose of frustrating NG's legitimate efforts to recover its collateral.  While any bankruptcy filing inherently delays collection efforts of a secured creditor such as NG, improper intent has not been shown.  As noted above, the Court found Debtor's testimony credible and concluded this case was not filed in bad faith.  Debtors have made significant efforts toward proposing a confirmable plan by modifying their farming operations to increase cash flow to fund plan payments and have presumably been making adequate protection payments.  In the Court's view, these actions, along with the Modification Agreement, the paydown on the NG debt, the consensual sale of acreage,

cattle and equipment with payment to NG, and Debtors' desire to work with NG outside of bankruptcy demonstrate Debtors' good-faith intention to pay NG on its claim – not a scheme to hinder or defraud it.  Accordingly, NG's requests for stay and *in rem* relief under section 362(d)(4) are denied.

### C. Section 1225(a)(6): Feasibility Objection to Confirmation

Chapter 12 was "designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land."  H.R. Rep. No. 99-958, 99th Cong. 2d Sess. 48 (1986), U.S.C.C.A.N. 1986, pp. 5227-5249.  Modeled after Chapter 13, it was enacted "in response to the agricultural debt crisis of the mid-1980s, *In re Mann Farms, Inc.*, 917 F.2d 1210, 1214 (9th Cir. 1990), and "was intended to enable family farmers to retain their farms while reorganizing their financial affairs."  *In re Hudson*, Case No. 08-09480, 2011 Bankr. LEXIS 1010, at *9 (Bankr. M.D. Tenn. March 15, 2011) (citing *In re Lockard*, 234 B.R. 484, 490 (Bankr. W.D. Mo. 1999)).

A chapter 12 debtor has the burden of proving that the proposed bankruptcy plan meets all confirmation requirements.  *United States v. Krause (In re Krause)*, 261 B.R. 218, 222 (B.A.P. 8th Cir. 2001).  It must be established that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6).  "Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment."  *In re Howard*, 212 B.R. 864, 878 (Bankr. E.D. Tenn. 1997) (citing *In re Foertsch*, 167 B.R. 555, 566 (Bankr. D.N.D. Feb. 3, 1994).  The Court considers debtor's projected income and expenses in deciding whether the debtors are likely to be able to make all proposed plan payments. *In re Chickosky*, 498 B.R. 4, 12 (Bankr. D. Conn. 2013) (citing *In re Elk Creek Salers, Ltd.*, 286 B.R. 387, 396 (Bankr. W.D. Mo. 2002)).  "The plan must also be realistic; the debtors must be

able to do what they are proposing." *In re Perkins*, Case No. 13-31277, 2013 Bankr. LEXIS 4539, at *33 (Bankr. E.D. Tenn., Oct. 30, 2013) (quoting *Howard*, 212 B.R. at 880).

In deciding whether chapter 12 debtors have met their burden, courts generally give them "the benefit of the doubt on the issue of feasibility, provided a reasonable probability of success is established." *Hudson*, 2011 Bankr. LEXIS 1010, at *19 (quoting *In re Lockard*, 234 B.R. 484, 492 (Bankr. W.D. Mo. 1999)). While not required to guarantee the success of a plan, a debtor nonetheless must "provide a reasonable assurance that the plan can be effectuated, and that reasonable assurance must rise above 'bare agronomic feasibility.'" *In re Crowley*, 85 B.R. 76, 79 (Bankr. W.D. Wis. 1988). The court must be able to review financial evidence presented by the debtor to render a considered opinion as to whether he has established a reasonable probability of the plan's success. *In re Ellis*, 478 B.R. 132, 139 (Bankr. N.D.N.Y. 2012). This "necessarily entails a determination of the comparative credibility of experts, as well as the credibility of the debtor." *Id.* (quotations omitted).

"Feasibility is never certain, particularly in farm situations. It is an element of confirmation that is difficult to prove [and] equally difficult to decide." *In re Kloberdanz*, 83 B.R. 767, 773 (Bankr. D. Colo. 1988). A debtor's income and expense projections are considered in conjunction with their actual past performance to determine feasibility. *In re Euerle Farms, Inc.*, 861 F.2d 1089, 1090 (8th Cir. 1988). "Because past behavior and productivity are excellent indicators of future production, courts have frequently rejected plans which are premised on highly optimistic projections of increased production." *Crowley*, 85 B.R. at 79. Courts generally give debtors every reasonable benefit of the doubt in matters concerning plan feasibility in furtherance of the rehabilitative policies underlying the Code but will not turn a blind eye and confirm a plan which

will not cash flow, and which is thus, unfeasible.  *In re Tofsrud*, 230 B.R. 862, 872-73 (Bankr. D.N.D. 1999).

The Court finds Debtors' past record of running a large dairy operation with an ability to make monthly secured payment obligations of $25,000 for "approximately ten years" indicative of Debtors' knowledge and commitment to farming.  (Trial Tr. 17).  While their business model changed to raising beef cattle after they sold their dairy cattle and equipment in April 2020 and remitted the proceeds to NG, Debtors' extensive experience and recent monthly operating reports[22] demonstrate an ability to feed, board and raise 250 (or more) beef cattle profitably.  Debtor testified the current income coming into the household and the farm, minus the expenses, left $8,621 per month, which is the required Amended Plan payment.  (Trial Tr. 53).  With regard to the estimated expenses, he further stated that "[w]e tried to estimate everything as high as we figured it could possibly be, and I mean even with the inflation and everything that's going on, I think we're still in the safety zone."  (Trial Tr. 63).  Debtors' expert Mr. Conklin testified he reviewed the Plan and associated pro forma at the time it was filed, along with the changes to the Cattle Contract and elimination of Patricia Worden's income, and concluded the projections provided for income to fund the plan.[23]  (Trial Tr. 102-103).

NG's expert, Mr. Dehm, expressed his opposing views, highlighting deficiencies with the projections and the Debtor's financial information from January – November 2022 that demonstrated Debtors are not able to make the Amended Plan payments.  (Trial Tr. 113-118; Ex.

---

[22] The October 2022 Monthly Operating Report (Debtors' Exhibit B) and November 2022 Monthly Operating Report (Debtors' Exhibit A) were stipulated into evidence (Trial Tr. 56); the Court also takes judicial notice of the monthly operating reports filed by Debtors for December 2022 and January through May 2023 (ECF Nos. 85, 86, 87, 88, 94 and 95 respectively).

[23] "Q: And in your opinion, do you think it's a feasible plan to- just to review, it's a three-year plan with payments to the secured creditor and then an extra year or (sic) payments directly to the creditor and then a lump sum to the creditor. A: Well, the plan provides for income to do that, and I think the validity of the cash flow – look this is not these fellows' first rodeo."  (Trial Tr. 102-103).

E).    Given the very recent changes to the Cattle Contract and Patricia Worden's loss of employment, he was required to recalculate several of the income figures on the witness stand. After recomputing the revised figures as discussed at the Hearing with an increase to 265 cattle at $1.65 per head per day, the removal of Mrs. Worden's outside income, and increasing the Amended Plan payments to $8,621 per month, Mr. Dehm concluded Debtors would still be operating with an annual negative cash flow of $2,845.  (Trial Tr. 162-164; 167).  Thus, there would be a shortfall of $237.08 per month, without addressing his expected increase in variable costs associated with a larger cattle herd.

In spite of Mr. Dehm's concerns, the Court finds Debtors have a reasonable probability of successful reorganization.  The Court credits Mr. Conklin's testimony and Debtor's confident statements regarding their ability to make the required payments, and will give Debtors the benefit of the doubt regarding what might reasonably be expected to occur in the next four years.[24]   In light of their lifetime of farming experience and recently demonstrated feasibility from modified farming operations, the Court considers Debtors' projections as more than "wishful thinking," *Howard*, 212 B.R. at 880, and finds the Amended Plan to be feasible as required under section 1225(a)(6).[25]

---

[24] While the Court found Mr. Dehm to be highly credible, his experience was primarily in dairy farming and not cattle farming, the Debtors' business.  The Court is not inclined to deny confirmation based on Mr. Dehm's revised shortfall of around $237.04 per month, or less than 3% of the proposed Amended Plan payment.

[25] It is also significant to the Court that when Debtors brought their real estate taxes current, the Trustee withdrew his objection to confirmation (ECF No. 79) which was premised on feasibility concerns as well as the tax arrears.  Clearly the Trustee would have pursued that objection if he was not comfortable the feasibility requirements of section 1225(a)(6) have been satisfied.

CONCLUSION

Based on the foregoing, it is hereby

ORDERED, that NG's Motion to Dismiss and Motion for Alternative Relief are denied; and it is further

ORDERED, that NG's Objection to Confirmation is overruled, and Debtors' Amended Plan is confirmed; and it is further

ORDERED, that Debtors' counsel is directed to submit a proposed Order Confirming First Amended Chapter 12 Plan containing all stipulations between the Parties and modifications put on the record at the Hearing, after review and approval by counsel for NG and the Trustee, within 20 days from the date of this Order; or if consent to said Order cannot be obtained, Debtors' counsel shall file a letter on the docket requesting a section 105(a) conference to address same; and it is further

ORDERED, that Debtors are directed to make their first monthly plan payment to the Trustee on August 15, 2023, and their obligation to make adequate protection payments to NG after the July 15, 2023, payment pursuant to the Order Directing Adequate Protection Payments (ECF No. 93) is hereby terminated.

# # #